**David SUGARMAN, Plaintiff,**

v.

**RCA CORPORATION, Defendant.**

**Civ. No. 84–1265.**

United States District Court,
M.D. Pennsylvania.

Oct. 11, 1985.

Elliot B. Edley, Wilkes-Barre, Pa., for plaintiff.

John H. Leddy, Frank C. Sabatino, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

This is a diversity action in which the Plaintiff, a Pennsylvania resident, was suspected of misusing Defendant, RCA's, long distance telephone system and was discharged. He claims breach of an employment contract, wrongful discharge, defamation and intentional infliction of emotional distress. The defendant, RCA Corporation (RCA), a Delaware Corporation with its principal place of business in New York, has moved for summary judgment pursuant to Fed.R.Civ.P. 56.

Specifically, Sugarman raises three counts. First, he contends that he was employed pursuant to a valid contract of employment. Further, he avers that in addition to a valid contract he had an employment contract arising out of corporate policy. Second, Sugarman alleges that he was wrongfully dismissed from his job with RCA in violation of a clear mandate of public policy. Finally, Sugarman claims that he was libeled and subjected to intentional infliction of emotional distress when RCA communicated the alleged wrongdoing to the Pennsylvania Unemployment Compensation Board without substantiating its charges against him.

In deciding RCA's motion for summary judgment it must be determined whether any disputed issues of material fact exist which would preclude entry of judgment. *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). Moreover, all reasonable inferences to be drawn from the underlying facts contained in the affidavits and depositions submitted to us are viewed in favor of the party opposing the motion. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). Further, whenever RCA relies upon affidavits, depositions, and answers to interrogatories to show that there is no genuine issue of material fact, Sugarman must come forward with affidavits, depositions, or answers to interrogatories sufficient to contradict RCA's showing. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); Fed.R.Civ.P. 56(e). Therefore, on the basis of the affidavits and depositions submitted by the parties, the facts may be summarized as follows.

Sugarman was employed by the RCA Service Company from 1969 until January, 1984. At the time of the alleged incidents complained of herein, Sugarman served as Recreation Coordinator of the Keystone Job Corps Center (Center) in Hazleton, Pa. His position with RCA entitled him to use a long-distance telephone system "Tacnet". Sugarman was assigned a five-digit code which permitted him to access the system in order to place long distance calls.

During the summer of 1983, an audit of the Center revealed that non-business calls had been made using Sugarman's Tacnet number. Sugarman's superiors revoked his Tacnet number and directed him to use the Center switchboard for work-related long distance calls until such time as he received a new code. Due to a clerical error, Sugarman received a new Tacnet number in October, 1983. When the error was discovered shortly thereafter, the number was cancelled. Sugarman received a memorandum explaining the reasons for the second cancellation on October 28, 1983. The aforementioned memorandum noted that the change would be temporary.

Following the cancellation of his Tacnet number, Sugarman found another five-digit number on his phone that would access the Tacnet system. Upon gaining access, Sugarman informed other employees at the Center.

Subsequently, from November 29 to December 3, 1983, Sugarman's superiors at the Center placed an electronic tracer on the phone in Sugarman's office. The trace revealed that a number of long distance calls were placed using the Tacnet System. Sugarman was then informed at a meeting held January 30, 1984, of the trace and results thereof. In attendance were Sugarman, Elwood L. Petchel, the Acting Center Director, Mary Ann Victor, Employee Relations Manager and, Maxine Rogers, Acting Director of Residential Programs. Sugarman admitted to making 2 personal calls to his brother. After Sugarman was informed of the trace results and admitted his use of the system, he was asked to resign. Sugarman resigned at the meeting, but later attempted to rescind his resignation. Despite Sugarman's attempted rescission of his resignation, RCA considers Sugarman to be involuntarily terminated from his employment on the basis of his conduct.

I

Count I asserts a claim for breach of contract. RCA asserts that it is entitled to

summary judgment on Count I because: (1) the record proves that no such contract existed, (2) even if a contract existed, Sugarman is unable to establish any of its terms, and (3) any such agreement would have been terminable at-will due to the absence of an ascertainable limit on duration. RCA also asserts that no employment contract arose out of RCA's employment "policy".

As the court in *Adams v. Budd,* recently stated:

... Pennsylvania law presumes that an employee serves at the pleasure of an employer and the relationship may be terminated by either party and at any time, absent a specific term of duration. (citations omitted). The Plaintiff may overcome this presumption by showing the parties intended the contract to be for some definite period of time or by showing that the plaintiff-employee gave the defendant-employer consideration in addition to the employee's normal services. An employer's "custom, practice or policy" can also create a contractual just cause requirement or contractual procedures by which the employer must abide.

583 F.Supp. 711, (E.D.Pa.1984).

In this case, there is no evidence with respect to an express oral or written contract between the parties. Instead, Sugarman has produced a letter from RCA to him dated November 13, 1968, confirming an offer for employment as an instructor with the RCA Service Company. While conceding that this letter indicates no specific terms of employment, Sugarman infers that references in the letter to "retirement benefits" and a "continuing relationship in the RCA family" may amount to terms of employment sufficient to establish a contract for a definite term or duration. In the alternative, Sugarman contends that the contract itself is in the hands of the Defendant RCA, and that all he can rely upon to demonstrate the existence of a contract for some definite period are his sixteen years of continuous employment and extrinsic facts of the agreement. A review of the affidavits and depositions submitted by the respective parties leads us to conclude that Sugarman's express contract claims, either oral or written, will not survive RCA's motion for summary judgment.

In support of his position that the parties intended the contract to run for some reasonable time, thus overcoming the presumption of an "at-will" employment contract, Sugarman cites *Forman v. BRI Corporation,* 532 F.Supp. 49 (E.D.Pa.1982). The *Forman* Court, citing *McNulty v. Borden, Inc.* 474 F.Supp. 1111 (E.D.Pa.1979), held that the presumption of an "at-will" employment contract may be overcome by demonstrating the "intent of the parties that the contract last for some ... reasonable time." Sugarman makes no averment as to what constitutes a "reasonable time" in this instance. The Court in *Forman* was able to ascertain a "reasonable time" because the Plaintiff asserted that Defendant entered into a multi-year employment contract pursuant to its five-year growth plan. In this case, however, Sugarman makes no argument as to what constitutes a "reasonable time" and, in fact, simply refers this Court to his review of RCA's undisputed facts to support his position. In contrast, RCA submitted the affidavit of Howard W. Keys, Manager of Employment Relations wherein Keys set forth two reasons why Sugarman could not have entered into a written agreement with RCA. First, he states that RCA policy does not permit agreements of this nature for employees employed at the Keystone Job Corps Center, and second, [A] thorough search of Sugarman's personnel file reveals that no such agreement ever existed. (Keys Affidavit, Exhibit B of Defendant's Brief). The record establishes that Sugarman did not remember what, if anything, he signed in 1969 and that his only obligation under the agreement was to do his job to the best of his ability. (Sugarman Dep. at 10).

In short, the evidence fails to establish an express oral or written contract for any definite term or duration. Sugarman is unable to point to a single promise or representation for the "continuation" of

his employment with RCA. (Sugarman Dep. at 5). Reliance on the bare supposition that the position was expected to last until retirement does not establish a specific term of employment. *Budd*, 583 F.Supp. at 714. Under Pennsylvania law such vague and conclusory statements are not sufficient to overcome the presumption of employment at will. *See Green v. Medford Knitwear Mills Inc.*, 408 F.Supp. 577, 582 (E.D.Pa.1976).

Sugarman then attempts to satisfy that his tenure was protected by an enforceable promise by trying to establish that he was a party to an employment contract which arose out of corporate policy.

■ This attempt to satisfy contractual prerequisites by a proposition that RCA's "Progressive Discipline" policy formed an implied contract for an unlimited period of time is unacceptable. The test is whether RCA's custom, practice or policy have created a contractual just cause requirement by which RCA must abide. *See Novosel v. Nationwide Mutual Ins. Co.*, 721 F.2d 894 (3d Cir.1983). Although a company's personnel policy can create an enforceable unilateral "contract" between it and the employee, there is nothing in the summary judgment record which raises a genuine issue of material fact as to the existence of any "custom, policy, or practice" which, pursuant to *Novosel*, would prevent the Plaintiff's discharge. Sugarman relies on the language of a corporate disciplinary document to suggest that there must be just cause for termination. We find that the language of the personnel policy under consideration is insufficient to alter RCA's power to terminate Sugarman at will. We specifically find the Progressive Discipline document to be a recommendation of procedure to be followed when dealing with an employee's performance and that RCA expressly reserved the right not to follow the recommended sequence if in their determination the employee's behavior did not justify it. *See Beidler v. W.R. Grace, Inc.*, 461 F.Supp. 1013 (E.D. Pa.1978). Accordingly, since Sugarman's at-will employment status was not modified in any way by RCA's disciplinary procedure there was no enforceable expectation in continued employment. To construe a contract on so general a statement would be tantamount to granting nearly every worker in Pennsylvania tenure by implied agreement. *See Leshko v. Dorr-Oliver*, 86 F.R.D. 343 (M.D.Pa.1980). For all of the above reasons, summary judgment will be entered for RCA on the contract count.

## II

■ Count II asserts a claim for wrongful discharge. The general rule in Pennsylvania is that an employee has no cause of action for wrongful discharge where there has been an at-will employment relationship. *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 31, 386 A.2d 119, 120 (1978). Therefore, absent a contractual or statutory right, either party to an employment relationship may terminate it at any time without liability.

■ An exception to this general rule has been established after *Geary v. U.S. Steel Corp.* 456 Pa. 171, 319 A.2d 174 (1974) acknowledged the possible existence of a non-statutory cause of action for wrongful discharge. Various decisions subsequent to *Geary* have carved into this holding rather narrow exceptions which recognize a cause of action for wrongful discharge when important issues of public policy are raised. *See e.g., Novosel v. Nationwide supra* (employee discharged for refusing to lobby the state legislature on the employer's behalf held to have violated a clear mandate of public policy); *Rettinger v. American Can Co.*, 115 LRRM 3011 (M.D.Pa.1984) [Available on WESTLAW, DCTU database] (dismissal in retaliation for employee's filing of a workman compensation claim); *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir.1979) (employee discharge for refusal to take polygraph); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (employee discharged for serving jury duty); *Compare Rogers v. IBM Corp.*, 500 F.Supp. 867 (W.D.Pa.1980) (no cause of action for wrongful discharge where employee was discharged because of relation-

ship with subordinate employee); *Beidler v. W.R. Grace, Inc.*, 461 F.Supp. 1013 (E.D. Pa.1978), aff'd memo., 609 F.2d 500 (3d Cir.1979) (no public policy violation, no cause of action for wrongful discharge where employee was discharged after company failed to follow its own evaluation policies).

In the recent case of *Novosel, supra,* the Third Circuit vacated and remanded the case instructing the district court to employ the balancing test set forth for wrongful discharge cases in *Yaindl v. Ingersol-Rand Co., etc.*, 281 Pa.Super. 560, 422 A.2d 611 (1981). *Id.* at 901. In *Yaindl* the Pennsylvania Superior Court stated:

> ... that the factors to be weighed are the plaintiff's interest in making a living, his employer's interest in running its business, its motive in discharging the plaintiff, and its manner of effecting the discharge, and any social interests or public policies that maybe implicated in the discharge. 422 A.2d at 620.

In the present case, Sugarman claims that the issues raised "fall within the ambit of protection afforded the public policy exceptions", and that "[t]here is a vital public interest to prevent the employer from profiting by its own wrongful act of an improper charge of theft...." (Doc. No. 14 at p. 8). Applying the factors as set forth in *Yaindl*, this Court finds that although Sugarman has not expressly identified a specific aspect of public policy violated by RCA, his complaint charges that RCA's motive was specifically intended to harm him. Allegations of specific intent to harm may support a claim for wrongful discharge. *See Boresen v. Rohm & Haas, Inc.*, 526 F.Supp. 1230 (E.D.Pa.1981). Plaintiff thus makes out a cognizable claim under this theory.

■ However, even though Sugarman alleges a cause of action cognizable under *Yaindl*, he is nonetheless unable to support it in the face of the present record. Summarizing Sugarman's claim in the light most favorable to him shows that there is no substance to the allegation that he was discharged as a result of a conspiracy or specific intent to harm. In fact, Sugarman's deposition demonstrates his complete inability to identify anyone at RCA who desired to harm him due to personal animosity. At deposition, he responded to RCA's questions with conclusory allegations which, at best, would amount to unfair treatment by RCA. Without more, such treatment does not give rise to an action for wrongful discharge. *Jackson v. J.C. Penney Co.*, 616 F.Supp. 233 (E.D.Pa. 1985). Further, even if Sugarman could show a violation of some public policy, we find that RCA had a plausible and legitimate reason for discharging Sugarman. Sugarman had not only been suspected, but, in fact admitted that on more than one occasion he improperly used the Tacnet system. (Sugarman Dep. at 17–18). *See Cisco v. United Parcel Service*, 328 Pa.Super. 300, 476 A.2d 1340 (1984).

In summary, Sugarman has failed to show that an important aspect of public policy was violated by his discharge. Plaintiff thus cannot recover under a wrongful discharge theory, and summary judgment on Count II of the complaint shall be entered in RCA's favor.

### III

In Count III Sugarman alleges claims for defamation and intentional infliction of emotional distress. He avers that RCA continually ridiculed, harassed and slandered the Plaintiff in the presence of his co-workers, and the general public. (Complaint at ¶ 27). Sugarman specifically bases his claim for defamation on communications allegedly made during six separate incidents, the first of which purportedly occurred in the summer of 1984. (Sugarman Dep. at 33).

The first incident occurred during an encounter with an RCA auditor, described by Sugarman as "a young female", when she allegedly entered his office "threw down a computerized ... three sheets of telephone calls that were made with [his] tacnet code number" and asked him to explain them. (Sugarman Dep. at 33). No one else was

present at the meeting. (Sugarman Dep. at 33).

The second incident occurred when Sugarman was called into the office of Doris Mulligan, Manager of Residential Programs, to review computerized sheets of telephone calls and to circle those calls he had placed. Sugarman claims he found this procedure to be harassing. (Sugarman Dep. at 33–35).

The third incident occurred when Sugarman was called into the office of a supervisor by the name of Russ Thompson and asked to account for those long distance calls he had made. (Sugarman Dep. at 36).

The fourth incident arose when Sugarman was questioned by Jack Fitzsimmons, Center Director, regarding the many long distance calls logged to Sugarman's number. (Sugarman Dep. at 35–36).

Fifth, Sugarman alleges that upon cancellation of his second tacnet code number he was informed in a telephone conversation by Steve Hollock, Manager of Fire, Safety and Security, that issuance of the second code number to Sugarman had been a mistake and that this caused him ridicule. (Sugarman Dep. at 37–38).

The sixth and final allegation of defamation was raised by Sugarman in his brief opposing RCA's motion for summary judgment. He alleges that RCA "has violated the rights of the Plaintiff by creating the allegation that Defendant initially attempted to prevent Plaintiff from receiving unemployment compensation by communicating the alleged wrongdoing to the Pa. Unemployment Compensation Board...." (Plaintiff's Brief in Opposition at p. 11).

With respect to Sugarman's first five defamation allegations, RCA argues that it should have summary judgment because: (1) every incident cited by Sugarman to support his claim in Count III involved a conversation he had with an RCA representative; (2) nothing defamatory was communicated; and, (3) there is no evidence that any third party was privy to any of the alleged discussions. We agree.

■ Generally, a defamation action must allege: 1) the defamatory character of the communication; 2) publication; 3) that the communication refers to the plaintiff; 4) the third party's understanding of the communication's defamatory character; and 5) injury. *Raneri v. DePolo*, 65 Pa.Cmwlth. 183, 441 A.2d 1373, 1375 (1982); *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F.Supp. 1314, 1326 (W.D.Pa.1974).

■ As stated above, publication of an allegedly false statement is a necessary element of the tort of defamation. *Lekich v. International Bus. Mach. Corp.*, 469 F.Supp. 485 (E.D.Pa.1979). On the issue of publication, Sugarman has raised no issue of material fact. The allegedly defamatory statements made by Doris Mulligan, Russ Thompson, Jack Fitzsimmons, Steve Hollock and an anomymous auditor (all RCA representatives), are Sugarman's sole basis for pleading defamation. In fact, Sugarman makes no allegations, either sworn or unsworn, that anything defamatory was communicated.

Specifically, Sugarman's conversation with the anonymous auditor during the summer of 1984 took place at a private meeting with no third person present. (Sugarman Dep. at 31–33). Similarly, Sugarman's conversations or meeting with Doris Mulligan or Russ Thompson (RCA representatives) amounted to requests that Sugarman "[c]ircle in red the phone calls he had made." Sugarman Dep. at 33–35). Further, the conversation with Jack Fitzsimmons took place in Sugarman's office. Regarding the events surrounding this claim, Sugarman testified:

> [T]here was a graduation over in the Recreation Complex; he stepped into my office before the graduation or after ... I'm not sure which and told me that RCA had made him aware of the problem ... "What seems to be the problem?" I think he asked me. I said, "Jack, somebody obviously has my number and has made many, many long distance calls." That was it. There was no further discussion between Jack and I concerning it. (Sugarman Dep. at 36).

At the time of the aforementioned meeting, Sugarman also testified that he did not know if anyone else was present in his own office. (Sugarman Dep. at p. 37). As to Sugarman's allegations that he was ridiculed by Steve Hollock, Manager of Fire, Safety and Security, Sugarman testified that he was informed via telephone that issuance of the second code number to him had been a mistake. (Sugarman Dep. at 37–38). Sugarman's account of the five alleged instances of defamation presents no genuine issue of material fact on the element of publication. He has presented no evidence that the allegedly defamatory statements had been communicated to third parties. *See Lekich v. International Bus. Mach. Corp., supra.* In *Lekich,* a former employee who had been discharged for making unauthorized long distance calls sued IBM for, *inter alia,* defamation. The Court, in granting summary judgment, found that the defamation count failed for lack of publication due to Plaintiff's failure to come forward with any evidence of publication. 469 F.Supp. at 487. In this case, which is factually very similar to *Lekich,* we find that RCA is entitled to summary judgment as a matter of law on the first five alleged incidents of Sugarman's defamation claim.

Sugarman's sixth claim for defamation, as stated earlier, arises out of an allegation that RCA, by communicating to the Pennsylvania Unemployment Compensation Board the basis for Sugarman's termination, libeled him. (Plaintiff's Brief in Opposition to Defendant's Motion at p. 12). We disagree. One is not liable for a publication of defamatory matter made on a conditionally privileged occasion, absent proof of abuse of that privilege. *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583

(1980); *Baird v. Dun & Bradstreet Inc.,* 446 Pa. 266, 285 A.2d 166 (1971). Further, a communication is privileged when it is made on a proper occasion, from a proper motive, in a proper manner and based upon a reasonable cause. *Id.*

Thus, proper occasions giving rise to a conditional privilege exist when: (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved. *See Keddie v. Pennsylvania State University,* 412 F.Supp. 1264 (M.D.Pa.1976).

Clearly, a proper occasion resulting in conditional privilege was present in this case. An interest of RCA was involved because reasons for Sugarman's termination, voluntary or involuntary, were called into question by the Pennsylvania Unemployment Compensation Board. In addition, the interest of the Pennsylvania Unemployment Compensation Board was involved because it was their duty as an administrative function, to investigate the claimant's eligibility for benefits.

We also note that abuse of a conditional privilege is indicated when the publication is actuated by malice.[1] *Berg v. Consolidated Freightways,* 280 Pa.Super. 495, 421 A.2d 831 (1981); *Baird v. Dun & Bradstreet, Inc. supra.*

The manifest reasonableness of RCA's conduct under the undisputed facts satisfies this Court that RCA is entitled to judgment as a matter of law with respect to all claims arising under the defamation count.[2]

Finally, Sugarman asserts a claim for intentional infliction of emotional dis-

---

1. Legal malice consists of a wrongful act, done intentionally without just cause or excuse, *Corobi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971), or generated from reckless or wanton disregard of another's rights. *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 191 A.2d 662 (1963).

2. Plaintiff argues that summary judgment is premature because the evidence will demonstrate that fellow employees, not in personnel, were

advised that Sugarman was terminated for improper use of the telephone. Plaintiff cites *Agriss v. Roadway Exp., Inc.,* 334 Pa.Super. 295, 483 A.2d 456 (1984) as dispositive of his position. In *Agriss,* an employee brought an action against Roadway for alleged libel. The Court of Common Pleas granted Roadway's motion for compulsory nonsuit. The Superior Court reversed, holding that: (1) charge of "opening company mail" which employer made against

tress. As stated in *Jackson v. J.C. Penney Co.*, supra:

> Pennsylvania recognizes this cause of action where one intentionally causes severe emotional distress by conduct that goes beyond all reasonable bounds of decency. The conduct complained of must be *so extreme* and *outrageous* so as to be regarded as atrocious, and utterly intolerable in a civilized community. (emphasis added) (citing *Rose v. Wissinger* [294 Pa.Super. 265], 439 A.2d 1193 (1982); *Jones v. Nissenbaum, Rudolph & Seidner* [244 Pa.Super. 377], 368 A.2d 770 (1976).

At 235.

Sugarman claims he was falsely charged with theft and was humiliated and embarrassed in front of his fellow employees. We conclude as a matter of law, that on the undisputed material facts of this case we could not permit a jury to find that RCA's conduct was outrageous. We believe that the procedure followed by RCA in terminating Sugarman's employment, precludes a reasonable finding that the dismissal was beyond the bounds of decency. Although it is reasonable to expect that Sugarman would feel embarrassed under the circumstances, no reasonable person would consider RCA's conduct outrageous. *Compare* e.g. *Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254 (E.D.Pa. 1977), aff'd en banc 595 F.2d 1265, 1273 (3d Cir.1979).

The evidence shows that Defendant RCA had a legitimate basis for the termination, and Sugarman has asserted no facts showing another motive to cause him harm.

### Conclusion

Plaintiff has failed to advance any plausible proof of at least one element of each of his three counts. Accordingly, Defendants are entitled to summary judgment as a matter of law. An Order consistent with this Memorandum follows.

---

employee in a warning letter was capable of impugning employee's good name or reputation in the popular sense and, given evidence of its circulation among fellow employees, was capable of a defamatory meaning; (2) an absolute privilege extended to employer in publication of warning letter, but since there was evidence that contents of letter were widely disseminated to persons who were not authorized to read letter, question for jury was presented as to whether contents of letter were published by employer in a manner that was not privileged; and (3) there was evidence from which jury could have found actual harm since charge contained in letter impaired employee's reputation and caused him personal humiliation and mental anguish. 483 A.2d at 456–466. We fail to comprehend how Sugarman can presently assert that his situation factually resembles *Agriss* in any respect. As we have already concluded, Sugarman has come forward with insufficient affidavits or depositions to show a genuine issue of material fact as required by *Adickes v. S.H. Kress & Co.*, supra and Fed.R.Civ.P. 56(e).